

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 17, 2020

**By ECF and Hand Delivery**

The Honorable Katherine Polk Failla
United States District Judge
Southern District of New York
Thurgood Marshall Courthouse
40 Foley Square
New York, NY 10007

   Re:   *United States* v. *Wellington Pinder*, 19 CR 273 (KPF)

Dear Judge Failla,

   The Government respectfully submits this letter in advance of the defendant's sentencing, currently scheduled for January 24, 2020 at 3:00 PM. For the reasons set out below, the Government submits that a sentence within the range of 10 to 16 months, which is the applicable range pursuant to the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"), is sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing, in particular here, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.

## Background

   On or about March 19, 2019 at approximately 3:20 PM, the defendant walked into the security screening pavilion at the public entrance of the Daniel Patrick Moynihan Courthouse where he approached a security screening terminal equipped with an x-ray machine to screen the personal belongings of visitors and a magnetometer to screen visitors. (Pre-Sentence Investigation Report ("PSR") at ¶ 8). There, he interacted with multiple CSOs manning the security screening terminal, including one CSO who was asking visitors for identification and directing them to the security screening terminal ("CSO-1"), one CSO who was operating the x-ray machine ("CSO-2"), and one CSO who was monitoring the magnetometer ("CSO-3"). (*Id.* at ¶ 9).

   When CSO-1 asked the defendant to display identification, he stated in substance and in part, "this better not be a fucking problem" before producing identification, as requested. When CSO-2 in turn asked him to place his personal belongings, including a jacket, in a tray atop the conveyor belt of the x-ray machine, the defendant again stated in substance and in part, "this better not be a fucking problem" before removing his jacket and placing it and other personal belongings in the tray, as requested. (*Id.* at ¶ 10). He next walked through the magnetometer, which alerted

to the presence of metal on his person, prompting CSO-3 to direct the defendant to walk back through the magnetometer. Having been asked to remove any metal from his person, including his belt, the defendant grew irate, repeatedly stating in reference to the CSOs, "you mother fuckers" and "you fucking assholes." Having been informed by the CSOs that he was free to leave the courthouse but must otherwise follow their directions in accord with established screening protocols, the defendant failed to remove his belt and walked back through the magnetometer, which again alerted to the presence of metal on his person. (*Id.* at ¶¶ 11-12).

At this time, CSO-3 handed the defendant the tray holding his personal belongings and directed him to leave the courthouse with his personal belongings. When he began to walk out of the courthouse with the tray still in his possession, he was followed by CSO-2 and CSO-3 who sought to recover the tray and escort the defendant out of the courthouse. (*Id.* at ¶ 13). At this time, the defendant turned around and spat at CSO-2 and CSO-3 with his spit striking both of them in the face. As the CSOs then restrained the defendant from leaving the courthouse, he stated repeatedly, in substance and in part, "If I had a gun, I would fucking shoot you." (*Id.* at ¶ 14). It required a team of multiple CSOs and Deputy United States Marshals to restrain the defendant, who violently resisted. (*Id.* at ¶ 18). A search incident to arrest identified that the defendant carried a razor blade concealed in one of his shoes. (*Id.* at ¶ 15).

## **Applicable Law**

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines are not mandatory; however, it also held that a district court must "consult" the Guidelines and "take them into account" when fashioning a sentence. *Id.* at 264. As the Supreme Court has explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, a court must proceed to consider seven factors outlined in 18 U.S.C. § 3553(a): (i) "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1); (ii) the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); (iii) "the kinds of sentences available," *id.* § 3553(a)(3); (iv) the Guidelines range itself, *see id.* § 3553(a)(4); (v) any relevant policy statement by the United States Sentencing Commission, *see id.* § 3553(a)(5); (vi) "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and (vii) "the need to provide restitution to any victims," *id.* § 3553(a)(7).

The statute directs courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, pursuant to which the sentence needs:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.* § 3553(a)(2).

While a district court may not presume that an appropriate sentence lies within the Guidelines range, "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. The relevance of the Guidelines throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a district court varies from a Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

## Sentence

Here, a sentence within the range of 10 to 16 months—which is the applicable range pursuant to the Guidelines calculated in the PSR as the defendant agrees—would be sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. The defendant's crime as charged and now admitted—assaulting court security officers—is by its very nature serious and deserving of substantial punishment. The court security officers perform a vital public safety function on which the very administration of justice literally relies. They can and must be protected from such assault through vigorous enforcement of the law. It also must be emphasized that the defendant's conduct here was egregious. In plain terms, without any provocation, the defendant verbally abused a team of court security officers with repeated profanity before picking a fight with them by spitting in two of their faces, after which he fought violently against his arrest and threatened to kill them, all after having attempted to enter the courthouse with a razor blade concealed in his shoe.

A Guidelines sentence would also be sufficient, but not greater than necessary, to afford adequate deterrence to criminal conduct. In this respect, the Government certainly acknowledges the doubt that Probation has expressed over whether any sentence can achieve a deterrent effect with the defendant, in light of his considerable criminal history, to which the Government returns below. (*See* PSR at 41). In contrast, the Government does perceive an opportunity for deterrence here in large part because of the defendant's criminal history and in particular his custodial history. Indeed, the hope for deterrence strongly motivates the Government's belief in the appropriateness of a sentence within the applicable range pursuant to the Guidelines, rather than a shorter incarceratory term, which Probation recommends. As Probation highlights, such a sentence of between 10 and 16 months would represent the largest sentence that the defendant has ever served during his adult life, much of which sadly has been spent in and out of custody. (*Cf.* PSR at 40 ("While he sustained no arrests between 2014 and 2019 when he was arrested for the instant offense, he was previously arrested regularly throughout the 1980s, 1990s, and 2000s. It does not appear any of his prior sentences, which other than an eight-month prison term in the late 1980s, have been short custodial or non-custodial sentences, have deterred [the defendant] from

continuing his anti-social behavior.")).  The Government is acutely conscious of the defendant's intellectual disability for which the Government has considerable sympathy.  With that said, the Government also affords considerable agency to the defendant in many of his life choices, including his choices implicated in the criminal conduct here, and believes that having experienced a substantial prison term the defendant will perceive a powerful incentive not to precipitate violence again in his interactions with law-enforcement and other public officials going forward, in which interactions he has demonstrated a proclivity for such violence, as discussed in greater detail below.

With respect to the danger posed to the community by the defendant's criminal conduct, the uncommon circumstances in which that conduct occurred highlight the risk that he presents to society around him.  On March 19, 2019, the defendant was the aggressor in his interactions with the court security officers, consistently escalating his own verbal and physical misconduct in response to the restrained directions of the court security officers, who were a group of large adults confronting the defendant in a well-lit, secure, and controlled environment.  The level of aggression that the defendant was prepared to exhibit toward those men and in that place concerns the Government because many of his interactions with other members of the public occur in far less settled situations and involve far more vulnerable citizens who may equally find themselves in the way of the defendant or otherwise frustrating, perhaps inadvertently, his aims.

Finally, the defendant's history and characteristics also weigh in favor of imposing a Guidelines sentence, and certainly an incarceratory sentence, which Probation recommends.  Between 1982 and 2014, the defendant was arrested on at least 60 occasions, resulting in 57 misdemeanor convictions in New York State for a myriad of crimes, including resisting arrest (x2), aggravated harassment (x3),  criminal possession of a weapon (x1), menacing (x1), assault (x1), attempted grand larceny (x2), possession of controlled substances (x5), sale of marihuana (x2), criminal contempt of court (x2), possession of stolen property (x1), and prostitution (x7).  What is perhaps most instructive about this criminal history from the Government's perspective is that since in or about 2000, the defendant has been arrested for resisting arrest in cases in which he was eventually convicted of that crime or another misdemeanor on at least five occasions in New York and once in Florida, showing a pattern of behavior consistent with his criminal conduct here.  Indeed as Probation highlights in its own recommendation for an incarceratory sentence, in 2000 he punched and kicked a police officer attempting to take him into custody and in 2010 spat at another arresting officer.  (*See* PRS at 40).  From this perspective, his criminal conduct here is not an aberration but rather a consistent aspect of how he conducts himself with law-enforcement and other public officials.  The Government is of course not blind to the fact that the defendant's intellectual disability certainly contributes to his having more frequent interactions with such officials, and indeed the Government considers that some of the limitations that the defendant experiences and that his sentencing submission highlights should prominently figure into the calculus of the Court in where to sentence the defendant within the applicable range pursuant to the Guidelines.  Based on its careful review of the defendant's submissions, both now at sentencing and in connection with mitigation proceedings, however, the Government does not consider that the defendant's intellectual disability predestines him to have both frequent *and* often violent interactions with law-enforcement and other public officials.  It is this dimension of his repeated conduct, present in his criminal conduct here, the inclination to aggression and violence, that the Government asks the Court to focus upon in sentencing the defendant.

## Conclusion

For the reasons set out above, the Government respectfully requests that the Court sentence the defendant to a term of imprisonment within the range of 10 to 16 months, which is the applicable range pursuant to the Guidelines.

Respectfully,

GEOFFREY S. BERMAN
United States Attorney

By: *Thomas John Wright*
Thomas John Wright
Assistant United States Attorney
(212) 637-1589

cc: Jonathan Marvinny (Federal Defenders of New York, Inc.) (by ECF)