United States District Court
Southern District of New York
-----------------------------------------
United States of America,

    -against-                                            19 Cr. 273 (KPF)

Wellington Pinder,

                    Defendant.
-----------------------------------------

### WELLINGTON PINDER'S SENTENCING MEMORANDUM

                                                        Federal Defenders of New York
                                                        Attorney for Wellington Pinder
                                                        52 Duane Street - 10th Floor
                                                        New York, New York 10007
                                                        Tel.: (212) 417-8792

                                                        Jonathan Marvinny

                                                        *Of Counsel*

To:  Geoffrey S. Berman, Esq.
      United States Attorney
      Southern District Of New York
      One St. Andrew's Plaza
      New York, New York 10007
      Att:  Thomas John Wright, Esq.
             Assistant United States Attorney

**Federal Defenders OF NEW YORK, INC.**

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

Southern District of New York
Jennifer L. Brown
*Attorney-in-Charge*

January 10, 2020

By email

Honorable Katherine Polk Failla
United States District Judge
Southern District of New York
40 Foley Square, Room 2103
New York, New York 10007

**Re:  United States v. Wellington Pinder, 19 Cr. 273 (KPF)**

Dear Judge Failla:

  This memo is submitted in advance of Wellington Pinder's January 24 sentencing for assaulting CSOs by spitting on them in the screening pavilion at 500 Pearl Street on March 19, 2019. For the reasons to be discussed, we respectfully request a non-incarceratory sentence that includes intensive treatment and monitoring on supervised release.[1]

  At the outset, we acknowledge Mr. Pinder's serious offense and do not seek to justify it. The CSOs protect everyone who enters 500 Pearl Street—including those of us with frequent business there—and they must be respected and kept free from harm.

  But there are facts here that cry out in mitigation. Mr. Pinder is 55 years old and intellectually disabled—indeed, he is among the most severely intellectually disabled clients counsel has ever encountered. He has an IQ of 62, a grave speech impediment, and considerable adaptive-functioning deficits. He has always lived in poverty, and has had to navigate an often-hostile world on his own, all while grappling with readily apparent difficulties that have made him a target for bullying and abuse. Because of this Mr. Pinder sometimes becomes overly defensive and struggles to control his anger— during the incident at 500 Pearl Street he got flustered by and overreacted to what others

---

[1] We have no objections to the PSR, including its Guidelines calculation of 10 to 16 months.

Honorable Katherine Polk Failla                                   January 10, 2020
United States District Judge                                           Page 2 of 7

Re:   United States v. Wellington Pinder
      19 Cr. 273 (KPF)

would recognize as routine requests from the CSOs. These facts are offered not to excuse his conduct, but to try to explain it.

Since his arrest, Mr. Pinder has been seeing no fewer than three separate treatment providers. He is doing his best to address his anger and substance abuse problems and is making good progress. And though he has a lengthy criminal history, it consists entirely of misdemeanor offenses, most of which are related to his history of poverty and substance abuse. These reasons and others to be discussed support our requested sentence.

**Mr. Pinder's background and cognitive difficulties[2]**

Mr. Pinder is 55 years old. He was raised in poverty in housing projects in Newark, New Jersey, where he was surrounded by "drugs, guns, and crooks." Tussey Report 3. He was in special education classes in his school years, and dropped out of high school at 17, though he would later graduate from a prevocational school. Finding work has been nearly impossible for him—he's held one job in his life, at Burger King, for a short time in 1991. He supports himself on food stamps and on the SSI and SSD payments he receives because of his learning disability.

As the Court has likely noticed during his court appearances, Mr. Pinder has a severe speech disability—he speaks exceptionally slowly, draws out his words, and employs frequently odd phrasing. This speech impediment both stems from and serves to emphasize his intellectual disability, and exposes him to ridicule. He is shy and easily embarrassed, but at his core is compassionate, gentle, and warm. His world is fairly limited. He has no children and has never married or had a meaningful romantic relationship. He has few, if any friends, and is intensely lonely. He spends his days in treatment programs, exercising, or in church.

Mr. Pinder has a not-insignificant history of substance abuse, including a stint with crack cocaine and an extensive history of marijuana use. As a result of these difficulties and others he has found himself intermittently homeless, thought he currently lives in a

---

[2] The facts in this section are drawn from the PSR and a report by Dr. Chriscelyn M. Tussey, a forensic psychologist and clinical neuropsychologist, who evaluated Mr. Pinder at our request. Her report is attached as Ex. A ("Tussey Report").

Honorable Katherine Polk Failla  January 10, 2020
United States District Judge  Page 3 of 7

Re:  United States v. Wellington Pinder
     19 Cr. 273 (KPF)

stable SRO in the Bronx. He has a lengthy criminal history but, until this case, it had consisted entirely of misdemeanor offenses. He is in Criminal History Category II with just three points. Indeed, a large portion of his convictions are for fare evasion and misdemeanor drug possession, a record commonly seen in state court among a certain class of offenders—namely, the poor, drug addicted, and mentally ill.

Dr. Tussey's testing found that Mr. Pinder has a full-scale IQ of 62, which places him in the bottom 1% of the population. *Id.* at 9. He tested particularly low in verbal comprehension and working memory. *Id.* at 10. He almost certainly qualifies as intellectually disabled given that his cognitive problems have been evident since his youth, and he has previously been diagnosed as "mentally retarded," a now out-of-favor term that has been supplanted by "intellectually disabled." *Id.* at 11–12. The "generally accepted, uncontroversial intellectual-disability diagnostic definition … identifies three core elements: (1) intellectual-functioning deficits (indicated by an IQ score approximately two standard deviations below the mean—*i.e.,* a score of roughly 70—adjusted for the standard error of measurement); (2) adaptive deficits (the inability to learn basic skills and adjust behavior to changing circumstances); and (3) the onset of these deficits while still a minor." *Moore v. Texas*, 137 S. Ct. 1039, 1045 (2017). Mr. Pinder appears to easily meet this definition, as Dr. Tussey reports: "Results from the current evaluation indicate that Mr. Pinder's intellectual abilities have likely remained stable over time and remain limited." Tussey Report 11.

**Offense conduct**

As for the incident itself, Mr. Pinder was at 500 Pearl Street by mistake. It appears he had received information in the mail suggesting he might be able to participate in a class-action lawsuit related to certain transit citations he'd been issued in the past, and was directed to appear on the 18th floor of some city agency to potentially enroll in the suit. Unfortunately, we are not certain which agency Mr. Pinder intended to visit, in part because, given his intellectual deficits, he has difficulty offering those kinds of details despite his best efforts.[3] But this account is consistent with what he told agents during his

---

[3] This difficulty was evident during his presentence interview as well. The PSR notes that "Pinder's responses were at times off topic and he was unable to provide specific information regarding certain periods of time. It appeared that the defendant was attempting to be forthcoming

Honorable Katherine Polk Failla                              January 10, 2020
United States District Judge                                  Page 4 of 7

Re:  United States v. Wellington Pinder
     19 Cr. 273 (KPF)

post-arrest statement—the only reference to his stated purpose in appearing at 500 Pearl Street that day in the agents' notes is this:

> Claim/Lawsuit ~~ctr~~ ②
> Transit

    In any event, we know that Mr. Pinder somehow confused his addresses and ended up at 500 Pearl. Then, not realizing he was attempting to enter a federal courthouse, he bristled when the CSOs requested he remove his belt and empty his pockets. He became overly hostile and eventually spit on two CSOs.[4] When searched he was found with a box-cutter blade that he used to cut marijuana cigarettes.

    Mr. Pinder's conduct was inexcusable, but not entirely unexplainable. Dr. Tussey opines that his "embarrassment [] manifests as irritability, impulsivity, and at times obstinance [sic], and/or he may simply not speak up and admit his lack of understanding." Tussey Report 13. His occasional hostility when pressed for information—he told Dr. Tussey as she questioned him during her evaluation: "I don't like to tell people my business … I don't have to tell my life to the whole world." *id.* at 2–3—is a defense mechanism for someone who has had to survive largely on his own in a world that is frequently hostile towards him. Prior records referenced by Dr. Tussey

---

and answered all questions, other than information that defense counsel did not wish to discuss." PSR ¶ 96.

[4] We acknowledge that being spit on is a traumatic experience under any circumstance, but we respectfully maintain that Mr. Pinder's HIV-positive status should not be treated as an aggravating factor. Though he has been HIV-positive since 1997, he is diligent about his treatment—he had his HIV medication on him when he was arrested—and is well aware that he has an entirely undetectable viral load. *See* PSR ¶ 108 ("Pinder's viral load is reportedly undetectable, [and] he has continued to take medications for several years."). More importantly, HIV *cannot be transmitted* through saliva in the first instance—that is, Mr. Pinder's spitting could not have communicated the virus. *See HIV Transmission*, Centers for Disease Control and Prevention, available at https://www.cdc.gov/hiv/basics/transmission.html (last visited Jan. 10, 2020).

Honorable Katherine Polk Failla  January 10, 2020
United States District Judge  Page 5 of 7

Re:  United States v. Wellington Pinder
     19 Cr. 273 (KPF)

show that he has struggled with feelings of hopelessness and worthlessness. *Id.* at 4. All of these factors cause Mr. Pinder to respond to stressful situations with inappropriate levels of anger and antagonism, just as he did when dealing with the CSOs. It is a problem he understands he needs to work on.

**A non-incarceratory sentence, but one that includes treatment and close monitoring on supervised release, is appropriate.**

The Court should not imprison Mr. Pinder, despite his troubling offense. His intellectual disabilities set him apart from other defendants and, critically, mean that he would be particularly vulnerable if incarcerated. Moreover, he is currently participating in treatment for his anger issues that appears to be productive and that should not be disrupted.

To begin, the law recognizes a defendant's intellectual disability as a significant mitigating factor. *See, e.g.*, *Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (finding that "impaired intellectual functioning is inherently mitigating"). Thus, for example, the law prohibits death sentences for the "mentally retarded." 18 U.S.C. § 3596. The Supreme Court in *Atkins v. Virginia* articulated the constitutional dimension to this prohibition, holding that in light of "our evolving standards of decency," executing the intellectually disabled violates the Eighth Amendment's ban on cruel and unusual punishment. 536 U.S. 304, 321 (2002). This is consistent with the now well-settled principle that the intellectually disabled lack the same level of moral culpability as other adults who commit the same crimes. *See id.* at 306 ("Those mentally retarded persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes. Because of their disabilities in areas of reasoning, judgment, and control of their impulses, however, they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct."). The same principle applies here and suggests that Mr. Pinder should be considered less morally culpable—and therefore treated differently—than others who engage in the same conduct as he. As Dr. Tussey explains: "Mr. Pinder's cognitive, intellectual, and likely adaptive functioning deficits, as well as his reported academic delays, impact his ability to attend to, process, learn, and utilize new information, and have substantial implications for his ongoing legal involvement and daily functioning." Tussey Report 12.

Honorable Katherine Polk Failla          January 10, 2020
United States District Judge             Page 6 of 7

Re:   United States v. Wellington Pinder
      19 Cr. 273 (KPF)

That said, Mr. Pinder is working to address his obvious anger management problems and would benefit from close monitoring while on supervised release. He is motivated to make progress, as he told Dr. Tussey. *See id.* at 4 ("He acknowledged that he would like to continue [treatment] as well as with therapy to address his anger.").

Thankfully, he has proven corrigible. He continues to attend The Alliance, a program supporting HIV-positive New Yorkers like him. He attends the program four days a week for four to five hours at a time. The program is in many ways the most important thing in Mr. Pinder's life. And it is effective. In a letter to this Court, his case manager describes him as "one of the most polite clients" in their anger management program and notes that he "is taking managing his anger very serious[ly]." *See* Alliance Letter (Ex. B).

Next, through Pretrial Services Mr. Pinder participates in treatment at the St. Mark's Place Institute for Mental Health on Mondays and Thursdays. There, he receives additional anger management counseling two days a week. His counselor there told the Probation Office that Mr. Pinder "has been engaged in their sessions" and "would benefit from continued mental health counseling." PSR ¶ 115.

Finally, Mr. Pinder also regularly meets with a social worker from our office, Brittany Larson. She works with him on many issues, including anger-management techniques like learning how to walk away from stressful situations rather than turn hostile. Letter of Brittany Larson 4 (Ex. C). She reports that Mr. Pinder has made good progress in controlling his temper since his arrest. *Id.* He of course has not reoffended or committed any act of violence since then.

All of this treatment has paid dividends already, and should continue to help going forward. Incarceration, on the other hand, would subject Mr. Pinder to serious potential harm. As Ms. Larson notes, "People with intellectual and developmental disabilities who are unable to pass as neuro typical are especially vulnerable to physical, financial, and sexual victimization, not to mention emotional distress [if incarcerated]." *Id.* at 4–5. Equally important, incarceration would disrupt Mr. Pinder's intensive treatment regime and his stable housing situation at his SRO. Routine is exceptionally important to Mr. Pinder and to his ability to make progress.

Honorable Katherine Polk Failla                    January 10, 2020
United States District Judge                       Page 7 of 7

Re: United States v. Wellington Pinder
    19 Cr. 273 (KPF)

    Incarceration would also delay Mr. Pinder's receiving the comprehensive supervision that the Probation Office will provide while he's on supervised release. Dr. Tussey opines that "[i]ndividuals like Mr. Pinder have a greater chance at success with specialized mental health treatment which simultaneously addresses his intellectual and cognitive limitations, substance abuse, and mental health," *id.*, and recommends that he receive services from the Office for People with Developmental Disabilities (OPWDD) and/or YAI (a network of agencies offering comprehensive services for individuals with developmental and intellectual disabilities), *id.* at 14. In addition, he should receive intensive substance abuse treatment to address his history of abusing various controlled substances and his ongoing use of marijuana. The Probation Office—not a prison—can help coordinate these services. *See id.* "([A] correctional setting is unlikely to be able to sufficiently meet the needs of an individual such as Mr. Pinder given his intellectual and cognitive deficits in conjunction with his medical condition and age."). And Dr. Tussey notes that the various factors at play in this case "render Mr. Pinder a good candidate for an alternative program with psychological, educational/vocational, and rehabilitative goals." *Id.* at 15.

—

    We respectfully ask the Court to impose a non-incarceratory sentence and a period of supervised release. Such a sentence would adequately balance the § 3553(a) factors and would be no greater than necessary to achieve sentencing's goals. Mr. Pinder has done well in treatment and should be permitted to prove to the Court that he is taking his responsibility to control his anger seriously. On this front, Dr. Tussey's report concludes with reasons for optimism. "Per records," it notes, "[Mr. Pinder] has recently responded relatively positively to treatment, and he is currently motivated to improve his life circumstances." *Id.*

Sincerely,

/s/ Jonathan Marvinny
Jonathan Marvinny
Assistant Federal Defender
212.417.8792
jonathan_marvinny@fd.org

# EXHIBIT A

[REDACTED]

# EXHIBIT B

**The Alliance for Positive Change**

Date: Wednesday January 8, 2020

To whom it may concern:

    Mr. Pinder is a 55 year old male African American male, who identifies as heterosexual. He is been a member of the Alliance for Positive Change since November of 2014. Client continues to be an engaged and reliable client to the program. Client has many goals that we are working on such as maintaining his medical and mental health adherence. Along with that, I am assisting client with housing. He is currently staying in a SRO that he has been in for some time. His HASA worker and I are working to get client in his own apartment. Client is still engaged with the Men's groups, FNS (Food and nutrition), and now he is also in another group called Health education. Which is helping client manage with everyday living. In addition, client did the PREP program here at the alliance and became a certified peer. Client completed this may 18, 2012. We are trying to get Client to become a peer intern at the alliance which is back to work program to help the client.

    Speaking as an employee of the Alliance for Positive Change and the care manager of Mr. Pinder I am 100% behind Mr. Pinder and his growth. Yes, he has made mistakes in the past and let his anger get the best of him. Client as shown a great improvement, and he going to jail will only hinder his success and any progress that he has made thus far. Even with client learning disability client is showing that he wants to learn and is putting the effort in on his own. Mr. Pinder is a client that shows great promise and with my efforts and support, we can keep him going in the right direction for him to grow. Client also is attending anger management classes every Monday and Thursdays, and from I see it working. Client comes into the agency has been one of the most polite clients and no issues where brought my supervisor or myself. Client is taking managing his anger very serious.

    If there is anything that I can do to help Mr. Pinder further, Please don't hesitate to call so we can put out heads together to further help the client continue to advance in a positive manor. Please contact me at (212) 645-0875 Ext 456.

Care manager Daquon Silva
Signature: _____
Date: January 8, 2020

64 West 35th Street, 3rd Floor, New York, NY 10001 | [p] 212.645.0875 • [f] 212.645.0705 • www.alliance.nyc

# EXHIBIT C

# Federal Defenders
## OF NEW YORK, INC.

52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director
and Attorney-in-Chief*

January 8, 2020

Social Work Assessment

**Re:    United States v. Wellington Pinder, 19 Cr. 273 (KPF)**

To whom it may concern,

I am a licensed social worker at the Federal Defenders of New York and I have met with Mr. Pinder weekly or every other week since March 2019.

From the moment he opens his mouth, it is clear that Wellington Pinder is different. His significant speech disability quickly distinguishes him from everyone else. He was teased and bullied mercilessly growing up in Newark, NJ. Wellington's intellectual disability is more hidden from the outside world than his speech disability but it is far more debilitating. His full scale IQ places him in the lowest 1% of the population. Ninety-nine percent of similarly aged peers have greater cognitive capacity and problem solving abilities.

Growing up in the 1970s, Wellington was classified as mentally retarded. Today, he is understood to have an intellectual disability (ID), but the functional impairments and the social stigma are no less serious. Wellington has trouble recalling dates, places, and events. This leads to frequent misunderstandings where people may think he is lying. It is quite common for people with intellectual disability to offer up inaccurate information in efforts to pass as a neuro typical person.[1] It is important to contextualize this behavior not as lying, but as a pro-social effort to survive and engage with a world not build to accommodate them.

---

[1] "Characteristics that persons with mental retardation may possess…that render them vulnerable in police stations and courts:

• Relying on authority figures for solutions to everyday problems • The desire to please persons in authority • The inability to abstract from concrete thought • Watching for clues to answers from interrogators • Bluffing greater competence than one possesses • A quickness to take blame • Short attention span • Problems with receptive and expressive language"

Despite limited intellectual capacities, people with ID have a normal or typical range of emotion. They have the capacity for joy, fear, love, sadness, etc. However, they learn differently and have less capacity to regulate emotions. Well-resourced children with intellectual and developmental disabilities are taught concrete strategies to manage their own emotional experience and to interact with others through Applied Behavioral Analysis and other modalities. A simple task is broken down into concrete steps and support, collaborative problem solving and a lot of positive reinforcement is provided at each step.

In my work with Wellington, I have tried to implement these techniques. Over the past ten months Wellington has identified goals and we have worked together to identify first steps and process emotions as they come up. These goals include employment, housing, managing interpersonal frustration, solving a problem with a friend and understanding the court case.

Wellington readily accepted any snacks or metrocards our office would provide so I suggested an MTA disability metrocard application. Completing this task involved many meetings, snacks, papers with a few large words and drawing of where and when to go and a lot of praise for efforts. We recognize that the legal system is not designed to provide positive reinforcement; however, research shows that is the most effective way to teach and support people with intellectual disabilities.

Wellington believes employment is worthwhile and admirable – so much so that sometimes he tells people he works at Burger King, as he first did with me. I gently asked clarifying questions to gather more details. It quickly became clear that at one point he had worked at Burger King, nearly 30 years ago, but he did not currently work there. It was also clear that he desperately wants employment to support himself and for his own self-esteem.[2] I referred him to NYS vocational rehabilitation, but after assessing what they were able to offer, Wellington chose to continue his efforts at Alliance to become a peer health specialist.

---

From Perske, R. (2003). Observations of a water boy. *Mental Retardation*, *41*(1), 61-64. And

*People with Intellectual Disability in the Criminal Justice System: Victims & Suspects.* The ARC: For People with intellectual and developmental disabilities. Available at https://www.thearc.org/what-we-do/resources/fact-sheets/criminal-justice

[2] "People with intellectual disabilities are frequently segregated from people who do not have intellectual disabilities. They tend to have fewer employment opportunities, and thus are economically less well off, are less likely to marry, have less satisfying social relationships and experience fewer community leisure opportunities than people without intellectual disabilities." From Beart, S., Hardy, G., & Buchan, L. (2005). How people with intellectual disabilities view their social identity: A review of the literature. *Journal of applied research in intellectual disabilities*, *18*(1), 47-56.

2

Consistent with Social Security Administration's assessment, Wellington is disabled and unable to maintain employment. Joyce, the peer health specialist instructor told me over the phone that Wellington has participated in numerous trainings; however, it is unlikely he will be able to pass the qualifying exam to be hired as a peer specialist. Nonetheless, he participates in the trainings and feels great pride upon graduation and sharing the knowledge.




When Wellington is scared, feels overcome with fear, his instinct is to resist. He has experienced bullying throughout childhood and adulthood, homelessness, and chronic poverty. Wellington has also struggled with addiction and chronic illness. He is socially marginalized via many aspects of his identify (health, race, class, lack of social support to name a few). Compared to the public, Wellington comes under threat often. Due to his intellectual disability, he is less equipped to navigate painful emotions than the average person.

Assessment-based treatment planning

Wellington needs intellectually appropriate mental health treatment to manage everyday stressors. He has been involved in substance use treatment and health and nutrition services with the Alliance for Positive Change for many years. They provide social services and health services to individuals with HIV/AIDS using cognitive behavioral therapeutic (CBT) techniques.

3

Wellington feels welcome and safe there, which is important for any service provision. Secondly, he can understand and implement the treatment concepts: avoiding substance use, HIV/AIDS medication compliance. These are concrete behavioral tasks for which participants earn positive reinforcement.

As evidenced by his success at the Alliance, Wellington has the capacity to learn new behaviors. He has participated in many classes and trainings on health and managing HIV and he is very proud to have an undetectable viral load; his records note his "strength in health literacy."

With this blueprint for success, we know that Wellington needs an environment similar to the Alliance focused on emotional responses and corresponding behaviors. Such an environment would need to feel safe, be welcoming, provide meals, provide transportation, and provide written/pictorial/verbal lessons that are appropriate to his intellectual capacity (preschool/elementary).

Twice weekly individual anger management counseling with Adam Siroky, LCSW, at St. Marks Institute has afforded Wellington the individual developmentally appropriate attention to navigate additional stressors that may come up in the community, at church or at the Alliance. Wellington understands that he visits Adam to talk and check in. Adam reports that they spend the session discussing Wellington's emotional and cognitive responses to specific instances that Wellington found frustrating. Describing the instance of frustration can itself be very distressing; however, revisiting the experience can allow for the discovery of different perspectives (maybe the person was upset with something unrelated to me) and realizing alternative courses of action (I could walk away instead of engage with them). Daquon Silva at the Alliance told me by phone since Wellington began anger management at St. Mark's he has noticed a positive change in Wellington's behavior at the program.

Additionally, I have met regularly with Wellington to review coping strategies to manage his mood and work on his goals. Strategies we have discussed and implemented include developing bodily awareness of mood (ex. body tension or increased temperature before anger reaction) and walking away from stressful situations. Recently, Wellington proudly stated that since the instant arrest in March, he has made significant progress controlled his temper and solving problems.

A custodial environment would be baffling and frightening for Wellington. Many of the social norms in prison are not explicit and Wellington would struggle to learn the rules quickly enough to secure his safety. People with intellectual and developmental disabilities who are

unable to pass as neuro typical are especially vulnerable to physical, financial, and sexual victimization, not to mention emotional distress.

Wellington understands that he behaved poorly and his actions were wrong - no one should be spit on. He has make great efforts to abide by the conditions of pretrial release and he hopes he will be afforded the opportunity to continue supervision on probation and continue anger management at St. Mark's Institute.

Respectfully submitted,

Brittany Larson, LMSW, Client and Mitigation Services